My name is Tom Girard. I'm arguing this morning on behalf of the town of Cromwell. I've reserved two minutes for rebuttal. Your Honors, we tried this case to a jury in October of 2021. The Comcast decision was rendered the year before, 2020. And Professor Schwemm's scholarly law review article, the Villanova Law Review that everybody cites to in our field, was only about four months old. So we went with the default standard being but-for causation in our Fair Housing Act case. Interestingly, the plaintiff's... You went with it because it's binding circuit precedent. I'm sorry? Oh, you went with but-for? We went with but-for. You argued for but-for. We argued for but-for causation because that was the default standard according to Comcast. And Professor Schwemm even predicted in fair housing cases, based on the language, you're going to get but-for claims. I know that there's a lot of debate about this. That's why we're here, of course. The professor didn't get confirmed. Sorry? The professor didn't get confirmed. He's not with us on that. No, no, no. But he's cited by courts. He's in decisions. He's decided by every lawyer in their briefs. Mixed motive is what the court went with. The plaintiff, interestingly, asked for a pretext charge. The court went with mixed motive. And my argument today is mixed motive is not the correct standard in a retaliation or discriminatory statements case. And it isn't in an intentional discrimination case either for three reasons. First is the Congress had the right, if it wanted to, to amend Title VIII in 1988 when there was an overhaul of the Fair Housing Act, and it didn't. It's shown a propensity to do that because three years later, in 1991, Congress amended Title VII and said mixed motive. What do you take away from the failure of Congress to do that? Well, it's not dispositive or determinative, but Congress has shown a propensity to do that if it has a mind to. And it had a mind to with respect to Title VII. And so one factor to consider is that Congress did not change Fair Housing standard and language in 1988 with respect to causation. Also, the ADA is but for causation. Public accommodation, Title II of the ADA, and the Fair Housing Act are essentially coterminous. They're treated the same that was in our case. It is in all the cases. And so if the ADA is but for causation, so should the Fair Housing Act. Is it a significant distinction that we have a history here of ratification by Congress of motivating factor test for causation in the face of what at the time was unanimous circuit precedent, including that the Fair Housing Act provided for motivating factor? I don't think you have that history with respect to the other statutory schemes. Tell me if that's right and if you see that as significant or not. Well, there were many decisions both ways in the Fair Housing cases before 1988. Some were using motivating factors, some weren't. You're including district court decisions? Yes. There weren't circuit court decisions going both ways, were there? No, but still, like I said, this isn't dispositive. But Congress has shown a propensity, if they choose to, to make things clear, if this is what they want. And they did that in Title VII. They didn't do it in Title VIII. The fact that the Americans with Disabilities Act is essentially coterminous with a public accommodation, Title II ADA case like we have here, and they use but-for causation, that's in the same direction as well. This court in Notovsky held that, and that's a 2019 decision, that the ADA had but-for causation. I say that that ADA equals the Fair Housing Act with respect to public accommodation, housing-based cases. The ADA was amended in 2008 and there were no changes. There's no motivating factor. Okay, well, Mr. Jordan, now I'm going to ask my question. Excuse me for interrupting, but I just want to make sure you had answered Judge Nathan, and I think you have. Suppose I basically agreed with you, that is to say, suppose I agreed that if I were writing on a clean slate, I would agree with you that this is the way the trend of the cases is going, the language is the same as the Supreme Court has in other contexts said, equals but-for. Like it or not, I think that's probably the law. If I thought that, writing on a clean slate, and this is kind of an inside baseball question, I guess, what do I do with the fact that in 2016, a panel of this court looking at basically the same constellation of Supreme Court case law, I know you're going to tell me that Comcast is different, but basically looking at the same kind of case law said, no, we're adhering to our precedent. You're going to tell me Comcast, and I'm going to tell you. The problem with Comcast is it's no different than the others. It's just another case in which some civil rights statute other than the Fair Housing Act, the Supreme Court says but-for. So I don't think it's a game changer. Or is it the fact that RBG throws in the towel there, that we're supposed to go with that? In other words, how can I say that the Supreme Court has given us new guidance since the Mahaney decision, when they've just given us the same guidance, the same type of guidance that our precedent says wasn't good enough? Mahaney, Your Honor, is distinguishable because it's an insufficient evidence case. That was a trial. It was appealed based on insufficient evidence to show motivating factor. I agree they used the motivating factor standard, but there was no issue of what about Gross? Gross is an ADEA case, and they used but-for. That was not allowed in that case. You're saying it's dicta in Mahaney. The affirmation of our prior precedent following Gross is dicta in Mahaney. Is that the point? Well, it's not. It's not. Yes, it would be dicta because they didn't analyze. Not necessarily dicta, but that was an insufficient evidence determination. They determined there was sufficient evidence at trial. They said we aren't getting into the but-for issue because you didn't raise it, and they didn't analyze it. So they didn't tear it apart, and it was pre-Comcast. Well, but then they went on and said, but anyway, even if it had been raised, this is what we'd say. So I'm here trying to work with you. So that you're telling me is dicta. That's got to be the answer. Otherwise, that would seem to bind us. Well, that is true, and that's my position. It didn't. It wasn't. It would be dicta. It wasn't about 30 seconds ago, but it is now. Well, I mean, it is exactly what it is. If we call it dicta, we do. If we don't, we don't. But they did not tear apart and analyze the but-for issue, and it was pre-Comcast. Mixed motive doesn't apply well in municipal cases. We are boards that decide things by 8-0, 7-1. You don't have a case where there's a 7-1 decision, and one person has a bad motive. Seven have a good motive. Is that a mixed motive decision by the municipality? It's just it's complicated for us. Do you want to move to vicarious liability and punitive damages? I'm sorry? Do you want to move to the other issues? Yeah, I do want to. I want to mention, if I could, just there are many reasons why punitive damages should not be allowed. There are no punitives allowed under the ADA or the Rehab Act, and they are allowed in 1983 against individuals, but they are not allowed against the entity, and there's good reasons for that, and those same reasons apply here. Well, but wait. Unlike any of those statutes, this is one in which Congress says there shall be municipal liability, and then they say, and the remedies that are available include punitive damages, without making any exception for municipalities. So why don't we read that as saying that Congress has clearly stated that municipalities would be subject to punitive damages? Well, 1983 allows punitive damages also. No, but only by implication, only because we look to tort remedies, because 1983 famously doesn't say much of anything. It just creates a liability, and then the rules surrounding that liability had to be made up by the courts. Here Congress told us exactly what they wanted the remedies to be. The Fair Housing Act was passed in the 1960s, and it didn't really implicate what municipalities were doing until the Fair Housing Amendments Act was passed in 1988, because then it brought in disability discrimination. At the same time that the cap on punitive damages was removed. Was removed. So they're saying at the same time, yeah, municipalities and big punitive damages are now allowed, and they make no exceptions. Well, look what happens. You have citizens that have nothing to do with the wrong that suffer, and they suffer dearly. There's 14,000 people in the town of Cromwell, and two people with the Internet rallied about 200. A very vocal minority is penalizing the majority. Which got the mayor and the town administrator and the town tax assessor to join their movement. Well, the claims are withdrawn against the mayor and the town. I understand that. But the facts are still what the facts are. You're telling us that the town is innocent in some way, because a vocal minority got the governing bodies of the town to act against the plaintiffs. It's a dangerous proposition to allow an individual to control the punitive damages against the municipality, because you want the individuals to have their own exposure so that they will say, if they think that I can say and do whatever I want, the town is going to cover me. I can just pass that off to the town. Okay. Well, my last question, this just sounds like policy argument as opposed to what Congress asked for. This may be a slightly unfair question, but have you read Department of Agriculture against Kurtz, which the Supreme Court decided last week? No. Okay. Well, there what seems to me to be a parallel is the Supreme Court unanimously says that a statute that's sort of formulated like this, where they have a generalized statement that includes governments among the persons who can be sued, clearly revokes, without any mention of sovereign immunity, the government's sovereign immunity, which is a much more fundamental defense than a common law immunity against punitive damages. And I commend it to your attention because it's a different context, it's not directly binding here, but it's the same structural situation of interpreting a statute that just says, in general, governments are persons and, therefore, can be both victims and perpetrators under the Fair Credit Reporting Act. And then, whammo, your sovereign immunity, the United States' sovereign immunity has been waived by that statute. It looks like a rather similar thing. But, again, it's a little unfair to impress you with that because it's a very brand-new case. Just a final comment. I'm watching the clock and I appreciate you allowing me. When the municipality has to pay, there's no insurance for this. It comes, things happen that are unintended and it hurts the majority. We'll lose the before and after school program that the people who are single parents and they go to work and they need to drop their kids off. We lose those programs. We lose Dial-a-Ride. We lose Meals on Wheels. We lose the Senior Center. The discretionary things are what we lose. We can't change contracts. There could be unfilled teacher spots. So classroom sizes increase. Bad things happen. We don't deserve punitive damages, is my message. And we don't deserve 27 times compensatory. That's what we got in this case, 27 times compensatory. Anything over 10 percent, we know from the BMW. Yeah, I mean, so apart from the overall overarching question of whether there can be any punitive damages at all, you did argue for, at a minimum, a remediator of some kind, right? Yes. As an alternative. And I'll be interested in hearing how the other side defends the size of this punitive damages award. I'll thank you. Thank you. You do have two minutes reserved. Thank you. All right, we'll hear next from Ms. Ramachandran. Ramchandran. Ramchandran. Ms. Ramchandran. And you've got six minutes with four minutes for the United States. When you're ready. Good morning, and may it please the court. Tara Ramchandran for Appellees, Gilead Community Services, and the Connecticut Fair Housing Center. I'd also like to recognize Dan Osborne, the CEO of Gilead, who's here with us in the courtroom today. In October of 2021, a jury found that the town of Cromwell had violated plaintiff's fair housing rights and awarded both compensatory and punitive damages to Gilead. Appellant now asks this court to reverse the jury's assessment by relying on statutes that are not even an issue here and to disregard both the Second Circuit and Supreme Court precedent. The statutes aren't an issue, but the same language of the statutes are an issue. So I think that's, of course, the question. At what point should we understand our prior precedent to be superseded by Supreme Court precedent interpreting the same statutory language? So I'd point this court both to Manny, which I know you discussed with opposing counsel, which is precedent in this court post-Gross, which had the same analysis of Comcast, finding the motivating standard is the appropriate standard for the Fair Housing Act. And in fact, this court has twice referenced it after Comcast, in Perry Cohn v. Toehill and in Thomas Tupper v. Catholic Charities. I'll also note that no circuit court has applied the Comcast standard to the Fair Housing Act post-Comcast, and six circuits have referenced the motivating standard post-Comcast. And so this court would be the first circuit court to reject that motivating standard factor for the Fair Housing Act. If I could turn to the punitive damages question and the ratio. So in BMW v. Gore, the Supreme Court laid out the three factors that we look to for assessing a punitive damages award. And here the two most salient factors are reprehensibility and the ratio between the actual and potential harm and the punitive damages award. I'd like to turn to the ratio first because that's where Mr. Gerard in his briefing spends the majority of his time. So here we have the ratio should be affirmed under the Gore factors for two reasons. One is when you compare the punitive damages award to the actual and potential harm, which is the standard for courts both in the circuit and under the Supreme Court, we're actually talking about something that's closer to a one-to-one ratio when you look at that potential harm. And the second is that- And that's an argument based on this $5 million contract? It's based on several factors. Mr. Gerard focused on that $5 million contract, but Judge Bolden pointed out that there was lots of evidence of potential harm in front of the jury. I'd point to three pieces of evidence the jury had in front of them. So one, of course, was the $800,000 per year contract for services that Gilead was then unable to provide for the community. The second was the diversion of Mr. Osborne's time. He testified- So the theory is that we take potential harms that appear to have been rejected by the jury for compensatory damages purposes but still use it to assess how we understand the appropriate ratio. So I would push back on the idea that it was rejected by the jury. The compensatory damages-the damages instruction in this case was not objected to and was very clear that Gilead had to show that there was proximate cause to the compensatory damages caused by the town of Cromwell. But in TXO Productions v. Alliance Resources Corporation, the Supreme Court upheld a ratio of 526 to 1, relying on evidence of potential harm not just to the plaintiff but to the community at large. And that's exactly what we have here, and it's why Judge Bolden upheld the award. The third- You're talking, though, you're-as Judge Nathan suggested, you're aligning compensatory damages over onto the punitive damages side. I'm a resident of this town. I thought-I didn't go to the meetings. I thought what happened was despicable. I didn't support it. I didn't participate in it. I'm, however, a member of, you know, middle-class resident of this relatively small Connecticut town. I didn't do anything. I'm going to see my municipal budget gutted. What's-why should I be made to suffer? None of my friends went to this. None of my friends share any discriminatory items. Judge Parker, let me ask that in three ways. So, first, the question about taxpayers really goes to the 1983 context. But under the Fair Housing Act, punitive damages are available without limitation. We're not talking about the availability of punitive damage. We're talking about the amount. And so to the second two points. So, first, this was a record in which the taxpayers were very involved. And so I point not just to the forum. I wasn't involved. I'm a taxpayer. My neighbors were taxpayers. They weren't involved. We had no animus against them. We don't believe in discrimination along these lines. So I would point the court to actually the amicus brief by the city of Middletown that was filed in this case. The what? The amicus brief filed by the city of Middletown where Middletown said punitive damages need to be assessed against municipalities in order to hold them accountable because of this fair share argument, right? There's no question about that because the statute authorizes punitive damages. What I'm pressing you on, counsel, is the amount. So I'll say the town of Cromwell made clear in a filing to the district court that the $5 million was not going to be a problem to pay. There's $113 million of assets as of July of 2021 that the town of Cromwell has, and they asserted that in an argument about why they should not have to post bond and to stay execution of judgment because there was plenty of money available in the town's coffers to pay for this award. And so when we think about the parade of horribles that Mr. Gerard kind of listed of lost services, there's no evidence of that in this record. Am I mistaken to understand that the Gore factors that you've referred to are about when punitive damages are unconstitutionally excessive under the excessive fines clause? That's correct, and that's the issue that Appellant raised. So that's not well, but they also raised just plain old remittiture, just like in any other tort case, right, that this is too much. It's just an abuse of discretion by the jury. And after all, that's not to say anything bad about juries or jurors. Jurors aren't ever told, here's what was awarded in this case, here's what was awarded in this other case. So they don't have any comparative framework. They have nothing to do but make up a number out of their heads. Judges are able to look and do comparative studies of whether this punitive damages award is consistent with other types of punitive damages awards in similar cases. Was any analysis of that kind done by the district court or by the parties? Yes, so Judge Bolden did that analysis in an opinion, and I think this court has to defer to it if we're looking at just the remittiture question, or abuse of discretion standard, of course, review it. And there, I would say this court is on sound footing to affirm the ratio of 27 to 1 here. In Kennedy v. Supreme Forest Productions, this court affirmed a ratio of 21 to 1 in a discrimination case. And in fact, other circuits have affirmed ratios that are much higher, 110 to 1. Those involved much smaller compensatory damages. I would also point this court to Hampton v. Dillard Department Stores out of the Tenth Circuit, where there was a 20 to 1 ratio, and the damages award there was $56,000 in a 1981 discrimination case. Can I ask you on the standard review, so if this is a due process, if it's an excessive fine case, it is a de novo analysis, and then we would make a determination on remittiture. If we concluded it violated the Constitution, it's a due process matter, de novo. Then we make an analysis without deference, I gather, on what an appropriate remittiture could be offered versus a new trial. As opposed to if we're assessing under a standard torts, it's just too much. That would be an analysis of abusive discretion with respect to the district judge's evaluation of the jury's determination? So there are multiple levels of deference at that point? That's correct, Judge Nathan. That's my understanding. So that constitutional de novo and the district remittiture is an abusive discretion standard. That said, if this court were to determine that there needs to be another look at the punitive damages award, you certainly could remand to the district court for that remittiture analysis, and presumably the district court would be in the best position to do that as they are most familiar with the record and would likely be most efficient. But again, I don't think any such remittiture is necessary, both under the actual and potential analysis, and then also just looking at the compensatory to punitive ratio here. All right. Thank you, counsel. Thank you very much. We'll hear from the United States for four minutes. Is it Mr. Bo-Kat Lindell? Yes. Can I say that? Yes, that's right. Thank you. When you're ready. Thank you. May it please the court, Noah Bo-Kat Lindell for the United States. I'd like to start, if I can, with some of the questions that Judge Lynch asked counsel for the town of Cromwell, because I think that gets to the crux of the punitive damages issue, which is what we're principally here to discuss. The Fair Housing Act's text expressly allows for punitive damages without differentiating at all between the defendants who are subject to them. If you look at the remedies provision, not only does it not differentiate between which defendants are allowed to get punitive damages authorized against them, but it allows for actual and punitive damages. That's a unit. It does not distinguish between which defendants could get actual damages as opposed to which defendants can get punitive damages. And everyone agrees that municipalities are subject to actual damages under the statute, and there's no textual indication that municipalities are subject to one and not the other. I'd also point the court to three different other pieces of textual evidence to support the fact that punitive damages are available against municipalities under the FHA. First, private aggrieved persons are authorized by the statute to intervene in cases brought by the Attorney General, and that includes a class of cases that are referred by the HUD Secretary to the Attorney General precisely because they involve the legality of municipal zoning or land use laws. And then the statute expressly authorizes courts to give those private interveners the exact same suite of remedies that they would receive under a private suit under Section 3613. So, counsel, I think these are persuasive textual arguments. The only question in my mind is when we've got a default rule of no punitive damages for municipalities, do we have any guidance on what level of clarity Congress is required to legislate with in order to overcome that default? Sure, Your Honor. So, first of all, nothing in facts concert suggests that you need to call out municipalities specifically. In fact, facts concert just involved a statute, as Judge Lynch pointed out, where there was nothing said at all about punitive damages and nothing in the legislative history as well. So it's at least clear from facts concert that either text or legislative history alone would be enough to authorize punitive damages. I would also point the court to the Eleventh Circuit's decision in Truestell v. Thomas, which we cite in our brief, and that's a case about the Driver's Privacy Protection Act, and that statute is very similar to the FHA where it makes municipalities proper defendants and then it authorizes punitive damages just across the board without calling out municipalities specifically. And there, Judge Pryor said that we cannot judicially carve out municipalities from a statute that authorizes liability against municipalities and just has an across-the-board punitive damages provision. So it upheld punitive damages against municipalities. May I ask you, have you read Kurtz? Not in detail. I'm aware of it. Yeah. But isn't that – I mean, there's a case where there's a clear statement rule about waivers of sovereign immunity, and the court blows past the clear statement rule altogether by saying it is a clear statement when you have exactly this structure, that there's a generalized statement about governments being liable, and you plug that into the statute that says here's what your remedies are against any violator of the statute. And sovereign immunity is gone. And it seems to me that's a – this is almost a fortiori from that because here we're talking just about a kind of common law tort practice, which may have purchased when you're interpreting a statute like 1983, which is devoid of procedural detail. But it's a little harder for me to see how we would not read the statute the way it's written. I think that's exactly right, Your Honor. And the presumption against punitive damages liability – may I just finish? Yes, and I have one more question. Okay. The presumption against punitive damages liability is a much weaker presumption than the presumption against sovereign immunity, as can be told by facts concerts itself, which looks, among other things, to the legislative history of Section 1983, which is not normally something that's allowed in sovereign immunity decisions. So, yes, certainly the presumption is weaker. The textual evidence is at least as strong as it is – as it was in Kurtz. Would you have it read yet? I'm generally aware of the statute, but yeah. What about the amount of the damages? How do you defend that? We don't take a position on the amount of damages. Let me just say that that is one response to the town's policy concerns, which, again, are not directly relevant under facts concerts because facts concerts only gets to policy after finding that there's no indication in the statute that they allow punitive damages at all. So those policy considerations should not come into play in terms of deciding whether punitive damages are available in the first place. But this question about the amount of punitive damages – The government takes no position. The government takes no position on the amount of punitive damages here. You do make an alternative argument that we could affirm, even if assessed under the Monell standard. For vicarious liability? Vicarious liability, yes. However, we think that the proper reading of the statute is to follow Meyer v. Holley. Yeah. I was just curious, thinking through the alternative argument, how that would – and for the reasons you've indicated, you might not need to reach it – but how it would work, given that it wasn't litigated below. Is the idea that this record could not support a jury conclusion that there's not vicarious liability? Right. I think, given the evidence in this case and given the proper legal standards under Monell, that this would be harmless error not to have used that Monell standard. But, again, we think primarily that this court should follow Meyer. Does the jury have concluded that there is liability to be assessed here that couldn't be deemed the responsibility of final policymakers? I don't think so, Your Honor, given that all of the – as we point out in our brief, all of the town officials who are making all of these decisions are final policymakers, and the town has conceded that they were all acting within the scope of their authority. So, given that we're talking about the town council authorizing things, we're talking about the mayor and the town manager who have control over a lot of the town's decision making, that they were the ones who were making these decisions and were involving town officials who were in charge of engaging in the specific activities that they actually engaged in, that these are decisions being made by those decision makers. But, again, I would just point the court back to the fact that, unlike for punitive damages, there is no general common law presumption against vicarious liability for municipalities, and that after the Supreme Court's decision in Meyer v. Hawley, it should be very clear that vicarious liability is available against municipalities under the Fair Housing Act. Just one quick question on the subject of things you're not taking a position on. I take it the government doesn't think we need a friend to help us with the but-for versus motivating factor? We did not take a position on that, Your Honor. Well, you did a little bit in a footnote. Sure, yes, yes. You played footsie with an opinion. Well, we don't take a position on which standard the court should use because the evidence is such that even if the court were to apply but-for causation, there would be no jury error here because of the nature of the evidence. Our interest is principally in making sure that if the court were to abandon the mix-motive framework and apply but-for causation, that it would apply that correctly. I was just worried that we wouldn't have a friend in the Supreme Court either if we adhere to our precedent because we weren't getting a friend here. But we just have to make our decision and we'll do so, with or without help from the government. Thank you. All right. Mr. Girard, you do have two minutes. Just for the government, I read your footnote three as to be friendly on that question. Mr. Girard, you have two minutes. Yes, thank you. Your Honors, the State of Connecticut has passed a statute that sets forth a policy goal for the number of beds municipalities should have for persons with mental health disability in their town. They go by percentage of population. Based on what your population is, you should have this many beds available. The Town of Cromwell exceeds that goal. I just want you to understand who the Town of Cromwell is that we're foisting punitive damages on. They exceed that goal. And Gilead actually has another home in the Town of Cromwell. They operated successfully for many, many years, 20 years. And with respect to what the mayor actually said— medical information to the media after a call for assistance was provided. And what does it tell us about other evidence in the record that goes to discrimination on the basis of disability? Well, look, the problem with that information, with what your Honor just said, is the employee of Gilead disclosed private information to the police when they responded. He was fired for that because that was a violation of his standards. And then the report goes out. It's a freedom of information report. I mean, it wasn't—we didn't make a press release or anything like that. But it got out in a police report because the Gilead employee said it when he shouldn't have said it to the police officer and the police write down what you tell them. What the mayor said, Gilead, we request you to consider relocating. This is after the town hall thing blew up. He didn't order them get out. It was nothing like it. They said we'll consider that. They actually had a board meeting, came back and said we've met and we're going to stay. That was the end of that. These are all plausible arguments, so they may be good arguments, but they were for the jury. No, I know, but they're for your Honors when you're thinking about who Gilead—I'm sorry, who Cromwell is and what the right number is for punitive damage. This is on the reprehensibility aspect. This is not a 27 to 1 case by any stretch. And I'll just leave it with Barnes v. Gorman. The ADA does not allow punitive damages. It's a spending cause case, and so the question is the clear notice with respect to the available damages. This isn't a spending clause case. But we are similar to the ADA in many, many, many decisions, so we would ask to be treated the same as the ADA on that issue. Can I ask you the process question on— Yes, we argued due process. So you argued due process. That's in my brief on page 46. Therefore, de novo review. De novo review by this panel. If we conclude as a matter of law that it was excessive, then what do you understand to be the procedure? That you're— We would remand for the district court to reevaluate remittitor or for a new trial, or how would you propose we proceed? I'm thinking that if it's just this punitive damages issue and it's not the instruction issue, that would have to come back for a new trial, and that's what we would ask for. But if it's just the valuation on the 27 to 1, then this court should follow through with that and order what the right number is. Without any deference to the jury or the district court in evaluation of the appropriate number? Your Honors, it's a de novo review. You can provide whatever deference— It's a de novo review of the question of whether— I think the way to think about it is it's a de novo review of the question of whether this ratio, this $5 million punitive damage award is excessive. I'm not sure that tells us procedurally what then to do in the event we reach that conclusion. I think, Your Honors, would then enter an order as to what the right number was and remand it for— Acceptance of that or a new trial. Exactly. Yes, exactly. And if it does go back under mixed motive and that becomes the standard in fair housing, I think we should have clear instructions as to all of us practitioners in the circuit as to exactly how that's going to look, because we didn't get an opportunity really to press that we have legitimate nondiscriminatory reasons. I mean, there has to be some respect of the ultimate but-for causation or causation of damages that we could say two things. Number one, we did not—there was—we can say even with the bad motive, we still would have made the same decision for all these reasons and convinced the jury that. We didn't have a chance to do that. That wasn't in our charge. And we also should be able to say, even if you think— So just to understand the structure of the argument, you're saying if we agree with— if we were to agree with you that but-for causation is the appropriate standard, the other side makes an argument that even still it would be harmless under but-for causation. And you're saying, no, it would have to go back for a new trial. Is that the point that you're making? Well, but-for causation would definitely have to go back for a new trial. But I was saying, even if Your Honors conclude that mixed motive is where we're going in this circuit for fair housing cases, we need—it should go back for a new trial on the appropriate standard, which would be akin to the Title VII standard that would allow a defendant to say, even with the improper motive, we would have made the same decision. I didn't have the right to do that. And I also didn't—under the charge. I was just arguing in thin air against that, you know, this is not a violation of the Housing Act. I'm sorry. Is this an argument that was made in your brief? No. Well, the— I mean, this is coming out of thin air. You could certainly have made this argument, I suppose, that—and you could have made it below, I guess, right, if the judge is going to give a mixed motive instruction. And you're saying, but you're not giving the right mixed motive instruction. You know, we think it should be but four. But, okay, you're going to go with mixed motive. It's not fair to do mixed motive without allowing us to argue this and that and the other or put it in this evidence, right? Well, we did make the argument below that we don't—we're not—you're not giving us the opportunity to argue that we would have made the same decision. But that was an argument for the ultimate causation standard. Yes, it is. You didn't seek a different charge under a motivating factor cause standard. Well, we were debating— Or make this argument in your briefs as far as— Yeah, because now you're making an argument that, hey, even if we lose, we still win, right? Even if we decide that it is a motivating factor standard and the circuit should adhere to that, which was the law of the circuit before, as the district judge found and as this case was litigated, that still now, for the first time, you're arguing that the judge didn't give the right motivating factor instruction and didn't allow you to do things that it's not clear to me you ever asked him to permit you to do once the but-for standard was rejected. And I don't get how that gets to happen. What we're saying is if Your Honors go with mixed motive as the standard in this circuit, we need clear direction as to exactly what that entails. There should be a burden of persuasion that shifts to the defendant if you're going to go with mixed— You say if we're going to go with it. You mean if we affirm the longstanding precedent of the circuit as still precedent, you're saying that there's lack of clarity as to how to instruct a jury in an argument which you did not make below? We did make the argument below, and we did argue in our briefs that we were not able to present the legitimate nondiscriminatory reasons that we had for making— Didn't you argue to the jury that it was security concerns that was motivating—that it was security concerns, security issues, safety issues? It was disruption. You argued that to the jury, did you not? I did argue to the jury. I did argue to the jury that the reason why the press release was made was that there was disruption in town, and we were trying to quell disruption. I did do that, but I was arguing in thin air. I mean, it would have been better for me if— What do you mean you were arguing in thin air? Well, if you read the— You're not permitted to do that. No, if you read the court's instruction on mixed motive, there was no burden shift over to the defendant for me to prove something. I was proving it like saying, well, you know, there is zero evidence of bad motive here. It's all 100% good motive, but I'm saying we need clarity on that because we did not get a burden shift. And if that's what—that's really what Title VII is all about. It's a burden of persuasion that shifts over to the defendant once that prima facie case is made in a mixed motive scenario. And what about the fact that I didn't get a mixed motive—I got a mixed motive charge on the retaliation claim, and no one agrees anywhere I've seen that that's okay. If you read the charge on retaliation, it says— This, too, is an argument not before us on appeal. No, no, that is. That's in our brief. Okay. All right. We have your arguments. Thank you, counsel. Thank you to all sides, including me and Mickey, for their briefing.